[Crim. No. 31901. Second Dist., Div. Two. Oct. 23, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
HENDRICK BERNARD JOHNSON, Defendant and Appellant.

**COUNSEL**

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Harold E. Shabo, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Lawrence P. Scherb II and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BEACH, J.—**

NATURE OF CASE:

Defendant appeals from the judgment of conviction after a jury found him guilty of robbery and using a firearm in the commission thereof. Appellant primarily contends that the trial court erred in admitting evidence of a lineup identification where he appeared without counsel.[1]

FACTS:

On April 13, 1977, at about 8:30 a.m., Dorris Smith (the victim) was walking down Florence Avenue between Hoover and Vermont Streets in

[1]Appellant also contends that there was unreasonable delay in arraigning him after arrest and also that the language of jury instruction number CALJIC No. 2.03 omits the word "intentionally" from the first sentence thereof. We deem the last contention to be meritless and bordering on the frivolous. We therefore do not discuss it, but confine ourselves to the discussion of the primary issues of the alleged delay and of the absence of counsel at the lineup.

the City of Los Angeles. She was approached by a man she subsequently identified as appellant who engaged her in conversation. She stated she was looking for a job; the man advised her his sister had just obtained employment at a nursing home and that he would drive her there. Dorris accepted, entered a blue (turquoise) Rambler station wagon with a white top, and was driven to an alley off Slauson Avenue and 58th Street. The man got out of the car, walked to a fence and seemed to beckon toward a window as if to encourage someone to join him but there was no response. After some minutes, Dorris indicated to the man she would go on alone. The man, however, reentered the car and drove it adjacent to a garage, stopping it in such fashion Dorris could not open the door on her side of the car, removed a gun from under the dashboard, pointed it at the victim's head close enough to touch it, and demanded the victim's money, purse, ring, and watch. When the valuables demanded were delivered to him, the man permitted Dorris to leave. Within a few minutes, Dorris called the police. Later the same day she made a written report of the incident which included a description of her assailant. The encounter described above lasted between 20 to 30 minutes, during which Dorris from time to time directly confronted her assailant visually, both frontally and in profile except during the moments he held the gun to her head, when she was too frightened to look. She observed he was dark, a "few inches" taller than five feet six and one-half inches, and had a two-inch scar on his left forearm. She indicated to police officers in her report made April 13 that a .38 caliber revolver shown to her by them looked "like the same type of gun" used in the robbery.

On the following day she saw what she thought was the same Rambler in which she was robbed, hailed a passing policeman and showed him a copy of the crime report she had made. The police officer put the Rambler under surveillance and ultimately stopped it and questioned appellant, who was its driver. The information comprising appellant's name, address, and who was the owner of the car, thus obtained, was relayed to another officer who, acting upon it, obtained a photograph of appellant. On or about April 25, 1977, the photograph of appellant was, with five others, shown to Dorris, who picked out appellant as the man who had robbed her. On May 19, 1977, a little more than three weeks later, other police officers armed with a warrant naming appellant proceeded to appellant's residence, stated they were there to arrest appellant and were granted entry by appellant's sister. They discovered appellant hiding under a bed. On May 23, 1977, appellant was included in a police lineup. He was identified by Dorris as the perpetrator of the

crime.[2] Appellant was not advised of his right to counsel before the lineup or at any time; he did not waive the right to counsel and he was not represented by counsel.

Appellant is six feet one inch or six feet two inches tall, darker than the victim and had a burn mark on his left forearm. Three .38 caliber bullets were found in one of his shoes. The three bullets were not nor was the .38 Smith and Wesson revolver which Dorris identified at the police station as similar, introduced in evidence, although they were referred to, nor was any revolver appellant was charged with using. Appellant claimed to have been shopping with his fiancee and some friends on the date of the robbery. However, he had earlier told police he was then driving his mother to the hospital. He denied he had a gun or owned a gun. None of the property of which Dorris was robbed was traced to or found with appellant. He maintained his hiding under the bed when arrested was due to his fear he was being sought in connection with an outstanding traffic warrant and that the bullets found belonged to a friend. He was the only witness for the defense.

Issues:

1. Was there an unreasonable delay?

2. Was the admission into evidence of a lineup identification where the defendant appeared without an attorney prejudicial error requiring reversal?

Our Holding:

We answer no to both of the above questions and we affirm the judgment of the trial court.

Discussion:

1. *There was no unnecessary delay.*

Appellant was arrested on Thursday, May 19, about 7:30 a.m. He was arraigned on Monday, May 23. Penal Code section 825 requires that an arrested person be taken before a magistrate within two days. At bench

---

[2]Appellant's arrest on May 19, a Thursday, occurred at approximately 7:20 a.m. He was presented for lineup identification the following Monday at 9:30 a.m. and sometime thereafter on the same day a complaint was filed charging him with the robbery. (Cf. Pen. Code, § 849.)

the statutory two days did not expire until the end of Monday, May 23. Saturday and Sunday are excluded in calculating the time. (Pen. Code, § 825.) This is not disputed by appellant. It follows that appellant was arraigned within the statutory time period allowed. Nonetheless appellant claims undue delay. He argues the police could have taken him before a magistrate before the expiration of the two days (appellant and respondent use the phrase "48 hours"). The statute does not support appellant. It allows 48 hours within which to take the arrested person before the magistrate. ■ No "unnecessary delay" is presumed merely because a defendant claims such delay. It would render the statute meaningless if the mere claim of a defendant created a presumption of delay. No statute and no case authority cited to us, casts upon the People the burden of coming forward in each case to demonstrate why an arraignment was not held prior to the time of the actual arraignment. The cases cited by appellant do not support his contention. The case of *People* v. *Williams,* 68 Cal.App.3d 36 [137 Cal.Rptr. 70], primarily relied upon by appellant is totally inapplicable. There the arraignment was beyond the statutory time of 48 hours. *People* v. *Powell,* 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137], does not aid appellant. The dicta simply indicates that an unreasonable delay might occur within the 48 hours. But appellant has demonstrated no such case here.

On the other hand, using the time allowed to prepare and evaluate a case before filing a complaint is not prohibited. Where a delay within the 48-hour period occurs in order to evaluate a case the delay is not unnecessary. (*Stanley* v. *Justice Court,* 55 Cal.App.3d 244, 250 [127 Cal.Rptr. 532]; *People* v. *King,* 270 Cal.App.2d 817, 822-823 [76 Cal.Rptr. 145]; *People* v. *Ross,* 236 Cal.App.2d 364, 368-369 [46 Cal.Rptr. 41].) There may be other valid reasons for not arraigning an arrested person immediately upon arrest and for using all or the greater part of the 48 hours allowed. Some of those reasons may include study and investigation to make certain that grounds exist to support a criminal complaint. (*People* v. *King, supra,* 270 Cal.App.2d at p. 822.) A delay which is occasioned by the conscientious performance of police and which is utilized for the purposes of clerical and administrative needs and not used solely for the purpose of eliciting damaging statements from the accused is not an unreasonable delay.

2. *The absence of counsel at the lineup was not prejudicial error.*

Appellant and respondent both argue whether or not the right to assistance of counsel under the Fourteenth and Sixth Amendments

accrues after defendant has been arrested but before a formal complaint has been filed against him in court. The dissent articulates the view that the interpretation of the *Wade-Gilbert* rule[3] in *People* v. *Fowler,* 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643], compels the presence of counsel at a lineup even if formal accusatory proceedings have not yet been started, as for example by the filing of a complaint with the preliminary magistrate. While that view may be supportable, on the other hand, *Kirby* v. *Illinois,* 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877], holds that the *Wade-Gilbert* rule requiring counsel or a valid waiver thereof does not apply when such lineups are held prior to the initiation of formal judicial proceedings. In affirming a judgment of conviction based upon evidence of a pre-accusatory lineup, the court in *People* v. *Chojnacky,* 8 Cal.3d 759 [106 Cal.Rptr. 106, 505 P.2d 530], followed the rule as expressed in *Kirby.* The dissent here and the dissent in *Chojnacky* indicate some doubt that the case so holds. The express statement of the majority in *Chojnacky* seems to indicate that *Chojnacky* did adopt the *Kirby* rule. The court there said "In view of the conclusion herein that the *Wade-Gilbert* exclusionary rule is inapplicable since the instant lineup *preceded* the initiation of judicial criminal proceedings, it is unnecessary to reach the issue whether defendant had effective assistance of counsel at the lineup." (*People* v. *Chojnacky, supra,* 8 Cal.3d at p. 763, fn. 2.) The court in *Chojnacky* also said: "Before *Kirby* this court in *People* v. *Fowler,* 1 Cal.3d 335 . . . held that the *Wade-Gilbert* rules were applicable to a formal pre-accusation lineup, and several California pre-*Kirby* decisions relied upon the conclusion in *Fowler.* [Citations.] *Fowler* and the other California decisions were based on the federal Constitution and are not controlling in view of the decision rendered by the United States Supreme Court in *Kirby.* At least one California post-*Kirby* decision has followed the rule in *Kirby* (*People* v. *Faulkner,* 28 Cal.App.3d 384, 390 . . . .)

"Since here the lineup preceded the initiation of judicial criminal proceedings, the *Wade-Gilbert* per se exclusionary rule is inapplicable, and defendant's previously recited claims of error based on that rule therefore cannot be upheld. No claim is made, nor does it appear, that the lineup was unnecessarily suggestive and conducive to irreparable mistaken identification." (*Chojnacky, supra,* 8 Cal.3d at pp. 764-765.) Although the present dissent further seeks to explain that *People* v. *Chojnacky, supra,* does not adopt the *Kirby* rule in California, we need not here debate that the *Kirby* rule was or was not adopted by *Chojnacky* nor need we advocate which view is·the better. ■ For the purpose of

[3]*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].

decision here we will assume the view of our dissenting colleague, that where an identification is sought to be made, counsel for the suspect is required at a "pre-accusatory in-person" lineup. Even assuming such a rule, we hold that the admission of the evidence of the identification of defendant at the in-person lineup under the circumstances of this case was harmless error beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Moore* v. *Illinois,* 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458].)

In the matter at bench there was strong, positive, and direct evidence abundantly sufficient in amount, character, and reliability to prove the guilt of appellant beyond a reasonable doubt. That evidence was totally independent of the lineup identification of appellant by the victim. In summary, that evidence is as follows: On April 13, the victim spoke to the defendant directly in a friendly unexcited manner. The conversation and confrontation face to face in a friendly manner lasted for the greater part of the 20 to 30 minutes of the total encounter with the appellant. Victim saw appellant closely in full daylight face to face. She saw the scar on his arm. It was in the same place and on the same (left) arm as was seen by the officer and as was seen by the jury at trial. She saw the letters of at least R and D at the end of the tattooed name BERNARD which was on her assailant's arm and which was on appellant's arm. She saw this tatoo just beneath the shirt sleeves of her assailant which were rolled in the same manner as appellant wore his sleeves at the trial. After she was robbed, she immediately phoned the police and described the above details. She also immediately gave a description of the Rambler station wagon and the color of the car. In the immediate description that she gave to the police she included the assailant's color, approximate height, and scar, all of which matched that of appellant.

The next day she saw the same car and immediately notified two nearby officers. The car was traced and appellant was identified as the driver of the car on that day. Appellant when arrested continued to fit the description including the scar, his height, the tatoo, and at the time of his arrest, he was in possession of three .38 caliber bullets. There was not the slightest shred of evidence that either on April the 25th or at the in-person identification there was any difficulty on the part of the victim identifying either the photo of appellant or appellant personally. There was no evidence that there was any suggestion, hint, or coaching.

As a result there is no evidence that her in-court identification of appellant was dependent upon or in any way tainted by any improper prior identification.

Contrasted with cases in which the observation of a defendant may be suspicious, the case at bench shows that most of the view of the defendant occurred during a friendly, unemotional, and casual conversation. The victim during the time of casual conversation was not excited, she was not in fear for her life or her safety, she was in no hurry, there was no other distracting commotion, and she was not in any physical or mental disability or distress.

Additional reasons why the evidence of the identification of appellant can be relied upon as worthy of belief are the following: the observation was while appellant was present in the daylight. It was not of some fleeing, obscure subject at night; there were no other victims to whom to give testimonial support or whose testimony needed bolstering or who spurred the imagination of the victim. This was a person-to-person encounter of extended duration. There was no need to confirm a guess. The problem of collusion among identifying witnesses or victims was absent. These are but a few of the items which differentiate this case from others in which the identification is critical yet problematic.

The evidence totally apart from the in-person identification overwhelmingly showed that appellant committed the crime. Although the description and identification first came from the lips of the victim alone it was corroborated by (1) the fact that the make, model, and color of car used by the assailant and described by the victim was uncontrovertedly traced to appellant as the driver and the appellant fit the given description of the assailant in color, height, scar, tattoo, and wearing of shirt sleeves; (2) the assailant's photograph was pointed out by victim without hesitation, hint, or coaching. Both of these things occurred long before the lineup.

The judgment is affirmed.

Fleming, J., concurred.

**ROTH, P. J.**—I dissent.

When at this point in time a person residing in California is illegally arrested in his home and thereafter incarcerated incommunicado for more than four consecutive days, actually in excess of 100 hours, before he is arraigned before a magistrate, such an event compels an analysis of

the procedure used by law enforcement officers of Los Angeles County to accomplish it.

The facts recited by the court's opinion as they will be amplified are undisputed and show appellant was deprived of two rights of constitutional dimensions by the arrest procedure followed and herein criticized. He was illegally arrested at 7:30 a.m. without a legal warrant in nonexigent circumstances in his residence.[1] The arrest was not a "Constable's mistake" but was made pursuant to an alleged arrest warrant sought and obtained by a calculated illegal procedure designed to enable the production of appellant at a formal lineup at which he could not insist upon and at which he was not represented by counsel. The procedure involved is encouraged by the principal law enforcement officer of the County of Los Angeles, i.e., the district attorney, and requires the participation of the investigating officer and the assistance of a judicial officer acting as a magistrate. It is conceded that the warrant was not issued as required by Penal Code section 813.

Appellant's motion to suppress evidence of the arrest and what had occurred during its execution, was denied but during the hearing thereof it was developed without dispute that:

"Q. Prior to that lineup—and I believe the lineup was held on May 23rd, 1977—did you attempt to have this case filed with any member of the District Attorney's Office?

"A. Yes, I did.

"Q. And was that with Mr. Myron Jenkins?

"A. Yes, it was.

"Q. And was it because of something Mr. Jenkins said to you that you then sought to have a lineup for this case?

"A. Yes.

"Q. And on the date when you went to have the case filed, would you indicate what you were told by Mr. Jenkins?

---

[1][BY RESPONDENT'S COUNSEL]:
"First of all, there was a probable cause arrest warrant in this case, and it was signed due to an affidavit in support of the probable cause arrest warrant."
It is conceded the warrant was obtained without the filing of any complaint (cf. Pen. Code, § 813). The arrest was based upon an affidavit presumably showing probable cause. However, neither the affidavit nor the warrant were introduced in evidence. Our efforts to augment the record on our own motion proved futile.

"A. Yes.

"Mr. Jenkins indicated to me that a photo lineup identification was insufficient for his office to file a complaint.

"He rejected the filing, and requested that I return with the case after getting a formal lineup."[2]

The deputy district attorney in court admitted:

". . . the case wasn't filed; had the case been filed the attorney could have been there and alleged some type of misconduct or active intention on the part of the police officers or law enforcement to deprive Mr. Johnson of an attorney.

". . . this was not done. And I believe that the law in California has followed the Kirby case; and since the Kirby decision, in every case involving this decision it is held that a preindictment lineup did not require the presence of an attorney. I know of no case to the contrary."

The court, denying appellant's motion to suppress, said in pertinent part: "That the officers did not act in bad faith in order to deprive the defendant of counsel at a lineup."

The district attorney, to legally justify the arrest procedure in this case, refers to and relied upon *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877] as authority that due process requirements are adequate protection to the accused prior to the initiation of an adversary judicial proceeding which would be initiated by a complaint. On appeal, the Attorney General relies upon Penal Code section 836 (authorizing a felony arrest without a warrant) and *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333],[3] and asserts that read in combination they justify the issuance of an *arrest* warrant without the filing of a formal complaint and that without the formal complaint no adversary judicial proceedings have begun. No other authority is cited for the proposition an arrest warrant may be issued in this fashion, which, in

[2]Identity is so conclusively established in the overwhelming majority of criminal cases brought to the attention of Courts of Appeal, that the judges of such courts are rarely seriously alerted to a rediscovery of the truth that no defendant can be convicted of even a demonstrated criminal offense unless it is established beyond a reasonable doubt that *the charged defendant* is the person who committed it.

[3]*Ramey* authorizes no such arrest on the facts of this case nor does any case cited by respondent and we know of none. (Cf. *People* v. *Hannon* (1977) 19 Cal.3d 588, 606 [138 Cal.Rptr. 885, 564 P.2d 1203], discussed *infra.*)

my view, is contrary to Penal Code sections 813-849. The warrant, based upon an officer's affidavit as a substitute for a complaint, was issued in a manner not provided for in the Penal Code. That being so, if the warrant is not void because the affidavit upon which it is based is an extra-legal substitute for a formal complaint, then the affidavit must be viewed as a complaint, pursuant to which an adversary criminal judicial proceeding was commenced and by virtue of which notice to appellant of his right to an attorney at the lineup was mandated. If, on the other hand, the affidavit is not viewed as a complaint, the arrest was illegal and the evidence obtained at the time of and during the arrest was illegal.

It is clear from the record that on or about April 25, when Dorris picked one of six photos identifying appellant, the investigating officers had all the facts in connection with the robbery committed on April 13, and that appellant could have been arrested at any place outside of his residence at any time after that date, but the district attorney on May 19 nevertheless refused to file a complaint because of the inherent weakness of a "one-on-one case." In addition, the record shows that the jury had some difficulty in reaching a verdict of guilty.[4]

It is significant too, that appellant was not arrested the day after the crime when the victim identified the Rambler appellant had been driving but did not identify the driver of the car who was the appellant. The officer following the Rambler eventually spoke to appellant and days later showed up with six photos one of which Dorris selected as a photo of the man who had picked her up on April 13, but the record shows no other police action with respect to appellant until May 19.

To me, it is completely irrelevant that appellant on the admitted facts might have been arrested on the street on probable cause without *any* warrant the day after the commission of the felony charged or could have been arrested without a warrant on the street on the same day he was arrested in his house approximately three weeks after the crime was committed if the constable had waited for him to come out on the street.

There is no contention that the warrant by the authority of which appellant was arrested in his home was a search warrant which required a search of the premises in which appellant resided.

---

[4]Jury deliberations began October 28 and were interrupted from time to time, once when it appeared the jury could not reach a verdict and once to enable them to have reread the entire testimony of the victim to the crime.

The arrest was made on a so-called *Ramey* warrant because the district attorney refused to file a complaint upon which a warrant to arrest appellant in his home could have been legally issued because it was office policy not to issue such a complaint in a *one-on-one case,* such as at bench, in which a victim of a robbery is the prosecuting witness even though the victim had identified appellant from a photo.[5]

It was clear to the investigating officer that a formal lineup was required by the district attorney, whereupon the investigating officer obtained an arrest warrant based upon his affidavit. Neither the affidavit nor warrant was made part of the record. Based on this warrant, appellant was arrested in his home. Four days after the arrest, a formal lineup was held. Appellant was not, nor is it contended that he was, advised of his right to counsel at such lineup, nor did he, and it is not contended that he did, waive said right. Within hours after the victim had identified appellant at the formal lineup, a complaint was filed charging the robbery of which a jury ultimately found him guilty.

It's bromidic to reiterate the principle that a person's privacy in a home, whether such person be a suspected felon or a paragon of virtue, and whether the home be a hovel or a palace, is sacred and that such privacy can be intruded upon only in strict compliance with law.

There are settled rules which bear upon the establishment of identity which we examine *infra.* These rules of constitutional dimension were violated in this case by a calculated and what appears to be an intolerable practice of the district attorney's office inspired by a miscalculation of what the law is in California with respect to the issuance of arrest warrants and the rights of a defendant on a formal lineup.

On June 12, 1967, the Supreme Court of the United States in three cases concurrently decided (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; cf. *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]) enunciated protective constitutional principles generally thought to be applicable by a respectable portion of both the federal and state judiciary in *all* instances in which a person suspected

---

[5]The court's opinion implicitly justifies the *Ramey* warrant and then proceeds to argue that the denial of appellant's motion to suppress was not prejudicial. Yet the fact remains that all the "evidence totally independent of the formal lineup . . ." was presumably before a seasoned deputy district attorney who refused to issue a complaint predicated upon such evidence.

of a crime is subjected to a formal pretrial lineup for purposes of identification. These protective principles require that persons subjected to such lineups are entitled to have counsel present in the absence of proof of a valid waiver of that right.

The federal doctrine announced in the above cases was meticulously analyzed by the California Supreme Court in *People* v. *Fowler* (1969) 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643] in an opinion by Sullivan, J., Traynor, C. J., Peters, Tobriner, Mosk and Burke, JJ., concurring, and McComb, J. dissenting, and was interpreted to so hold. The *Fowler* court said in pertinent part:

"Fifth and finally, we think it clear that the establishment of the date of formal accusation as the time wherein the right to counsel at lineup attaches could only lead to a situation wherein substantially all lineups would be conducted prior to indictment or information. We cannot reasonably suppose that the high court, recognizing that the same dangers of abuse and misidentification exist in *all* lineups, would announce a rule so susceptible of emasculation by avoidance.

"For the foregoing reasons we have concluded that the 'post-indictment' language in the *Wade* and *Gilbert* opinions is simply descriptive of the facts before the court in those cases and was not meant to limit the operation of the rules announced. We further conclude that those rules are wholly applicable to the formal pre-accusation lineup here in question." (Fns. omitted.) (*People* v. *Fowler, supra,* 1 Cal.3d at p. 344.)

It was clearly established by *Fowler* and in my opinion remains the law today that in-court identification of the defendant based upon or not independent of lineup identification as well as evidence of the prior lineup identification itself are not permissible when it is clear from the record as it is at bench the appellant had no counsel at the time of the lineup identification.

A seeming departure of the doctrine enunciated by the *Fowler* court has been created by the majority opinion in *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877]). *Kirby* holds that the *Wade-Gilbert* rule requiring counsel or a valid waiver thereof at lineup does not apply when such lineups are held prior to the initiation of formal criminal judicial proceedings. (See also *Moore* v. *Illinois* (1977) 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458].) Respondent contends the *Kirby* rule was adopted by the Supreme Court of this state in *People* v.

*Chojnacky* (1973) 8 Cal.3d 759 [106 Cal.Rptr. 106, 505 P.2d 530]. I do not agree.

In *Chojnacky*, defendant's counsel *was present* and it was thus not necessary to arrive at the conclusion reached there by reference to *Kirby*. Defendant in *Chojnacky* complained *his counsel was ineffective at the lineup*. There is language by the majority in *Chojnacky* to the effect: "*Fowler* and other California decisions were based on the federal Constitution and are not controlling . . . ." (*People* v. *Chojnacky, supra,* at p. 764.) But it is also clear from a separate concurring opinion by Mosk, J. that "Counsel was in fact present throughout the staging of the lineup"; and the concurring opinion further states in pertinent part:

"Manifestly 'any' pretrial confrontation and 'all' confrontations for identification imply no limitation to post-indictment proceedings. Thus our court properly interpreted *Wade-Gilbert* to apply to every lineup, no matter when held. (*People* v. *Fowler* (1969) 1 Cal.3d 335, 342-344 [82 Cal.Rptr. 363, 461 P.2d 643].) It would seem obvious that if an accused is entitled to the protective presence of counsel at a lineup, the chronology of the lineup with respect to other proceedings is of no consequence.

"I have heretofore expressed reservations concerning the role which attorneys may assume at lineups and have indicated its limitations (see my dissent in *People* v. *Williams* (1971) 3 Cal.3d 853, 858 [92 Cal.Rptr. 6, 478 P.2d 942]). But I have not doubted that *Fowler* is the law of California . . . ." (*People* v. *Chojnacky, supra,* 8 Cal.3d at p. 767.)

*Chojnacky* was decided by a six-judge court. The Mosk opinion concurred only in the judgment. Sullivan, J. dissented and was joined by Tobriner, J. I am aware others have viewed *Chojnacky* differently. (*People* v. *Williams* (1977) 68 Cal.App.3d 36 [137 Cal.Rptr. 70]; *People* v. *Strawder* (1973) 34 Cal.App.3d 370 [108 Cal.Rptr. 901]. See also *People* v. *O'Roy* (1972) 29 Cal.App.3d 656 [105 Cal.Rptr. 717]; *People* v. *Faulkner* (1972) 28 Cal.App.3d 384 [104 Cal.Rptr. 625].)

But in my view even though it is assumed that the doctrine enunciated by *Fowler* was limited by *Kirby,* no assumption can be made that it was erased or modified by *Chojnacky*. The facts in *Chojnacky* fulfilled the requirements of the *Fowler* doctrine and it is clear that Mosk, J. concurred in the *Chojnacky* judgment for that reason.

It is equally clear, in my judgment, that under the facts here present even *Kirby* supports a conclusion of error. The better understanding of

that decision is that any procedural step taken by prosecutorial authorities which under state law is deemed to initiate "formal criminal judicial proceedings" involves Sixth Amendment rights with respect to lineup identifications. Here, respondent relies on the fact that no formal complaint was filed at the time the arrest was made and that therefore no formal proceedings had commenced. This contention is maintained in spite of the facts there exists no statutory authority for the issuance of an arrest warrant in such fashion and that the warrant could only have emanated from facts set out in the supporting affidavit, which of necessity must have been the same as those which would have been contained in the complaint had it been filed as required. Accordingly, were we to look no further than the federal Constitution, our result would be the same.

We are left, nevertheless, with the question whether appellant should not be accorded the benefit of the *Fowler* doctrine by virtue of the requirements of article I, section 15 of our state Constitution.[6] In this respect we are mindful of the observation: "As we noted in *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, footnote 4 [123 Cal.Rptr. 297, 538 P.2d 753]: '[I]n the area of fundamental civil liberties—which includes not only freedom from unlawful search and seizure but all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental civil rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law.' We have consistently adhered to the foregoing rule of interpretation and in our nation's system of federalism it is as fundamental a principle of constitutional law as that which rests ultimate authority for interpretation of the federal Constitution in the United States Supreme Court." (Fn. omitted.) (*People* v. *Hannon* (1977) 19 Cal.3d 588, 606[138 Cal.Rptr. 885, 564 P. 2d 1203].)

---

[6]"Sec. 15. The defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and to be confronted with the witnesses against the defendant. The Legislature may provide for the deposition of a witness in the presence of the defendant and the defendant's counsel.

"Persons may not twice be put in jeopardy for the same offense, be compelled in a criminal cause to be a witness against themselves, or be deprived of life, liberty, or property without due process of law."

Consistent with this summary of adjudicatory responsibility, we consider it essential to examine what rationale supports a conclusion the rights described in *Wade* and *Gilbert* should extend further under our state Constitution than arguably they have been held to do under that of the United States. In this regard we need look no further than the analysis contained in *Fowler,* which pointed out: "We have concluded that the *Wade-Gilbert* rules are not limited in their application to lineups occurring after indictment. Our reasons are several. First, and perhaps most importantly, we find nothing in the reasoning of those opinions, and have ourselves been able to conceive of no reason, requiring that the rules should be so limited. The presence or absence of those conditions attendant upon lineups which induced the high court to term such proceedings 'a critical stage of the prosecution' at which the right to counsel attaches (388 U.S. at p. 237 [18 L.Ed.2d at p. 1163]) is certainly not dependent upon the occurrence or nonoccurrence of proceedings formally binding a defendant over for trial. A lineup which occurs prior to the point in question may be fraught with the same risks of suggestion as one occurring after that point, and may result in the same far-reaching consequences for the defendant." (Fns. omitted.) (*People* v. *Fowler, supra,* 1 Cal.3d at p. 342.)

In *Wade,* the issue simply stated consisted of whether "the assistance of counsel at the lineup was indispensable to protect Wade's most basic right as a criminal defendant—his right to a fair trial at which the witnesses against him might be meaningfully cross-examined. . . ." (*United States* v. *Wade, supra,* 388 U.S. 218 at pp. 223-224 [18 L.Ed.2d at p. 1155].)

"In sum, the principle of *Powell* v. *Alabama* and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." (*United States* v. *Wade, supra,* at p. 227 [18 L.Ed.2d at p. 1157].)

It was reasoned that: ". . . the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from

a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. [¶] Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' [¶] The pretrial confrontation for purpose of identification may take the form of a lineup, also known as an 'identification parade' or 'showup,' as in the present case, or presentation of the suspect alone to the witness, as in *Stovall* v. *Denno,* [388 U.S. 293]. It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eyewitness identification." (Fns. omitted.) (*United States* v. *Wade, supra,* at pp. 228-229 [18 L.Ed.2d at pp. 1158-1159].)

"The few cases that have surfaced therefore reveal the existence of a process attended with hazards of serious unfairness to the criminal accused and strongly suggest the plight of the more numerous defendants who are unable to ferret out suggestive influences in the secrecy of the confrontation. . . . Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' " (Fns. omitted.) (*United States* v. *Wade, supra,* at pp. 234-236 [18 L.Ed.2d at pp. 1161-1162].)

Similarly, in a dissenting opinion in *Kirby,* Justice Brennan pointed out: "In view of *Wade,* it is plain, and the plurality today does not attempt to dispute it, that there inhere in a confrontation for identification conducted after arrest the identical hazards to a fair trial that inhere in such a confrontation conducted 'after the onset of formal prosecutorial proceedings.' *Id.,* at 690 [32 L.Ed.2d 418]. The plurality apparently considers an arrest, which for present purposes we must assume to be based upon probable cause, to be nothing more than part of 'a routine police investigation,' *ibid.,* and thus not 'the starting point of our whole system of adversary criminal justice,' *id.,* at 689 [32 L.Ed.2d at p. 418]. An arrest, according to the plurality, does not face the accused 'with the prosecutorial forces of organized society,' nor immerse him 'in the

intricacies of substantive and procedural criminal law.' Those conse-quences ensue, says the plurality, only with '[t]he initiation of judicial criminal proceedings,' '[f]or it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.' *Ibid.* If these propositions do not amount to 'mere formalism,' ibid., it is difficult to know how to characterize them. An arrest evidences the belief of the police that the perpetrator of a crime has been caught. A post-arrest confrontation for identification is not 'a mere preparatory step in the gathering of the prosecution's evidence.' *Wade, supra,* at 227 [18 L.Ed.2d at p. 1157]. A primary, and frequently sole, purpose of the confrontation for identifica-tion at the stage is to accumulate proof to buttress the conclusion of the police that they have the offender in hand. The plurality offers no reason, and I can think of none, for concluding that a post-arrest confrontation for identification, unlike a post-charge confrontation, is not among those 'critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' " (Fns. omitted.) (*Kirby* v. *Illinois, supra,* 406 U.S. 682 at pp. 697-699 [32 L.Ed.2d at pp. 422-424].)

I find the reasoning articulated in favor of a broader application of the *Wade-Gilbert* rules not only persuasive but compelling, and agree that: ". . . surely the assistance of counsel, now established as an absolute post-indictment right does not arise or attach because of the return of an indictment. The confrontation of a lineup . . . cannot have a constitution-al distinction based upon the lodging of a formal charge. Every reason set forth by the Supreme Court in *Wade* . . . for the assistance of counsel post-indictment has equal or more impact when projected against a pre-indictment atmosphere." (*Wilson* v. *Gaffney* (10th Cir. 1972) 454 F.2d 142 at p. 144.)

Nor do I regard my conclusion only a means of expressing disagree-ment with the plurality in *Kirby*. To the contrary, I accept the premise there is no inherent virtue in expanding state constitutional safeguards beyond those existing at the federal level and that such a course should be followed only where there is a sufficient basis in state law for the result. (*People* v. *Hannon, supra,* at p. 606.) That basis, I believe, is contained in the posture assumed by our Supreme Court in *Fowler* and it is, of course, irrelevant to the question at hand whether that decision as such was or was not overruled by *Kirby* since its *ratio decidendi* applies equally to any consideration of article I, section 15. In *People* v. *Hannon, supra,* though that case was concerned with the right of a defendant to a

speedy trial, it was said: "Before an arrest warrant can be issued, a criminal complaint must be filed as a preliminary step. (Pen. Code, § 813 et seq.) The filing of such a complaint renders the charged individual an 'accused' for purposes of article I, section 15 of the California Constitution. . . . Thus the existence of an arrest warrant means that the individual named in the warrant, whether served or not, enjoys the protection of the right to a speedy trial guaranteed by the California Constitution." (*People* v. *Hannon, supra,* 19 Cal.3d at p. 609, fn. 11.)

If it is true one named in an arrest warrant may enjoy appropriate constitutional protection, even though the warrant has not been served, a fortiori must that be the case where he has been arrested, with or without a warrant.[7]

Of course, an objection may be made that the necessity of counsel on formal identification occasions will unnecessarily delay pursuit of the matter involved and impede effective police procedures. However, I cannot grant that consideration controlling effect since it should never be the case that constitutional safeguards may be sacrificed to expedience. Nor is the burden imposed by the requirement any different in essence than those arising out of other protective requirements whose efficacy is no longer even argued. (See e.g., *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].) Accordingly, and for the reasons set forth above, the judgment appealed from should be reversed if the error committed creates a conviction in the mind of this court that it is reasonably probable a different result would have been reached if it had not been committed. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]; cf. *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Fowler, supra,* at p. 350.) My review inclines me to conclude it is reasonably probable a more favorable result to appellant would have occurred in the absence of the lineup evidence. The jury, after a limited retirement, indicated to the trial court a preliminary inability to reach a verdict and were encouraged to proceed further. Later, they requested the victim's testimony be re-read to them in full, thus focusing on its importance to their deliberations. No other personal identification testimony was present to

---

[7]The suggestion that in the instance where a warrant has been procured, as opposed to a warrantless arrest upon probable cause, there exists a distinguishable "judicial" intervention seems to us specious if sought to be applied in the context of constitutional rights and, moreover, at odds with the preference which always inheres in favor of obtaining the warrant. That is to say, how is it explained one's rights are justifiably more at mercy when the less desirable procedure of a warrantless arrest is used than when a warrant is obtained?

associate appellant with the crime. None of the victim's stolen belongings were traced to or found with appellant. Finally and most importantly, the lineup identification served to buttress substantially the victim's prior photographic identification of appellant and to solidify her in-court certainty that he was the offender.[8] It is reasonably probable that the case against appellant turned upon formal lineup testimony. In spite of the fact the victim had earlier named appellant as the perpetrator of the crime she had done so from a selection offered by police of only six pictures. It would not strain reason to suppose the notion one of those pictures was the criminal was then present in her mind. If that were so, appellant's subsequent lineup identification became even more crucial. By the same token, the presentation of identification evidence before the jury was systematically and consecutively put forth by the prosecution as an unbroken chain: photograph—appellant as criminal; lineup—appellant as criminal; person at the bar—appellant as criminal—rising in its effect to a crescendo of implication, where, without its second link, it might have been less than convincing within the requirements of reasonable doubt.

The foregoing review of the evidence is made on the theory that the warrant under which appellant was arrested was legally issued based upon an officer's affidavit which was deemed to be a filed complaint initiating adversary proceedings. On that theory, what occurred at the time of and during the arrest was admissible. However, if the filing of the officer's affidavit is not considered as a complaint and the arrest was illegal, then the evidence of appellant's hiding under the bed, his excuse therefor and all the testimony of the officers as to what they saw and heard at the time of and during his arrest were not properly before the court, and the motion to suppress the same should have been granted. In that posture of the case, it becomes emphatically clear to me that it is reasonably probable a result more favorable to appellant would have been reached.[9] I would therefore reverse the judgment.

On November 14, 1978, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 20, 1978. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

[8]It is instructive on the question of the reliability of photographic identification that the district attorney's policy at the time the instant prosecution began was, as noted earlier, that no complaint would be filed by that office where identification was limited to a single victim unless there was also a lineup identification.

[9]Based upon this conclusion, I have refrained from touching upon the majority's reasoning respecting the question of delay in arraignment, which seems to me at odds with Penal Code section 825 and our Supreme Court's language in *People* v. *Powell* (1967) 67 Cal.2d 32 at pages 59-61 [59 Cal.Rptr. 817, 429 P.2d 137].